UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PATRICK J. CONNORS,

        Plaintiff,

   v.

IQUIQUE U.S.L.L.C., et al.,

        Defendants.

CASE NO. C05-334JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on three related motions: Defendants' motion under Fed. R. Civ. P. 60(b) to modify the court's August 25, 2005 order compelling the payment of maintenance (Dkt. # 52), Plaintiff's motion to force Defendants to comply with that order (Dkt. # 69), and Defendants' motion for summary judgment on their intentional concealment defense (Dkt. # 56). The court has heard oral argument on the motions and has considered the parties' briefing and supporting evidence. For the reasons stated below, the court DENIES Defendants' summary judgment motion, DENIES their Rule 60(b) motion, and GRANTS Plaintiff's motion in part and DENIES it in part.

## II. BACKGROUND

Plaintiff Patrick Connors is a maritime engineer who served aboard the F/V UNIMAK ("UNIMAK"), a ship that Defendants own, beginning in late May or early June

ORDER – 1

2004. Before boarding the UNIMAK, Plaintiff disclosed to Defendants that he had undergone heart bypass surgery in 2000. On June 15, 2004, Plaintiff experienced chest pain while lifting a pump onboard the ship. He returned to shore and went to a hospital on June 17, 2004. Since then, he has undergone a variety of cardiac treatments for complications from coronary artery disease. His cardiologist, Dr. Lawrence Haft, does not believe that Plaintiff will ever be able to return to work.

On August 25, 2005, the court ordered Defendants to make maintenance payments to Plaintiff through at least November of this year. (Dkt. # 43). The court based its order largely on Dr. Haft's June 23, 2005 declaration that Plaintiff continued to receive medical treatment for "conditions related in part to Mr. Connor's [sic] work for Iquique U.S. L.L.C. on or about June 15, 2004," and that this treatment was "curative in nature." Haft Decl. ¶ 6(d). As stated in the order, the court relied on Dr. Haft's declaration in determining that Plaintiff was entitled to ongoing maintenance payments because he had presented sufficient evidence of a still-improving injury or illness that manifested aboard the UNIMAK. The court acknowledged that Defendants could still prevail on the maintenance and cure claim on a motion for summary judgment or at trial, but that the evidence then before it, coupled with Supreme Court instructions to resolve ambiguities in favor of seamen, justified maintenance payments pending later adjudication.

Although more than two months have passed since the court ordered maintenance payments, Defendants have not complied with the order. The court denied Defendants' motion for reconsideration on September 13, 2005 (Dkt. # 47). On October 4, Defendants moved for relief from the order, claiming that new information they acquired at Dr. Haft's September 21, 2005 deposition demonstrated that their obligation to pay maintenance ended in December 2004. The next day, they moved for summary judgment that Plaintiff intentionally concealed his heart condition from them when applying for the position

ORDER – 2

aboard the UNIMAK, and thus forfeited his right to maintenance payments. On October 12, 2005, Defendants appealed the August 25 order to the Ninth Circuit. In the meantime, Plaintiff's already precarious financial situation deteriorated further as he awaited court-ordered maintenance payments that are now more than two months overdue.

### III. ANALYSIS

Because intentional concealment could provide a complete defense to Plaintiff's claim for maintenance, the court will turn first to Defendants' motion for summary judgment. The court will then address Defendants' argument that their obligation to pay maintenance terminated in December 2004. Finally, the court will consider Defendants' failure to comply with its August 25 order.

Each of these motions concerns Defendants' obligation to pay maintenance and cure. As the court first noted in its August 25 order, a shipowner's obligation to provide maintenance and cure has its roots in ancient maritime law. Vaughan v. Atkinson, 369 U.S. 527, 532 n.4 (1962). When a seaman is injured in service of his vessel, the shipowner has an obligation not only to bring the seaman to a port for treatment, but to pay maintenance (compensation for room and board equivalent to what the seaman would have received aboard the vessel) and cure (payments for medical treatment necessary to restore the seaman to health). Id.; see also MARTIN J. NORRIS, THE LAW OF SEAMEN §§ 26:5-26:6 (3d ed. 1985). Maintenance and cure are available even where the shipowner is not at fault for the seaman's injury. Berg v. Fourth Shipmor Assocs., 82 F.3d 307, 309 (9th Cir. 1996). The obligation to continue maintenance extends until the seaman has reached "maximum recovery" from the injury or illness he contracted aboard the ship. Id., Gardiner v. Sea-Land Service, Inc., 786 F.2d 943, 946 (9th Cir. 1986).

ORDER – 3

**A.   Disputed Facts Prevent Summary Judgment on Defendants' Intentional Concealment Defense.**

In reviewing Defendants' summary judgment motion on intentional concealment, the court must draw all inferences from the evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the opposing party must show that there is a genuine issue of fact for trial. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Defendants base their intentional concealment defense on Plaintiff's responses to a five-page "Health Questionnaire" that he filled out on the day Defendants hired him. When a seaman intentionally conceals his medical condition to a shipowner, he may lose his entitlement to maintenance and cure. Burkert v. Weyerhaeuser S.S. Co., 350 F.2d 826, 829 n.4 (9th Cir. 1965). A defendant must show that the seaman concealed a medical condition that "he kn[ew] or should [have] know[n] is related to the illness or injury for which maintenance and cure are requested." Omar v. Sea-Land Serv., Inc., 813 F.2d 986, 990 (9th Cir. 1987).[1]

---

[1] Defendants argue that intentionally concealing a medical condition in responses to a pre-employment questionnaire is intentional concealment regardless of whether the seaman believed the condition to be relevant. Defs.' Mot. at 5 (citing McCorpen v. Cent. Gulf S.S. Corp., 396 F.2d 547, 548-49 (5th Cir. 1968)). The Ninth Circuit implicitly rejected this rule in Omar, when it adopted Second Circuit authority that rejected McCorpen. 813 F.2d at 990 (citing Sammon v. Cent. Gulf S.S. Corp., 442 F.2d 1028, 1029 (2d Cir. 1971).

ORDER – 4

Plaintiff's responses to Defendants' medical questionnaire contain inaccuracies, but they also contain warnings of a potential heart condition. Plaintiff disclosed his 2000 bypass surgery five times in the questionnaire. He checked "yes" in response to a question about "Any Heart Problems or Family History." He also revealed his long history of smoking and his diabetes, two known risk factors for coronary artery disease. Defendants point out that Plaintiff inaccurately responded to questions about whether he was currently taking medication, whether he had ever missed work for health reasons, whether any medical condition had restricted his ability to work, and whether he had ever experienced chest pain. Defendants also identify several other apparent inaccuracies in the questionnaire, but none of them are relevant to Plaintiff's heart condition.

A jury must decide the intentional concealment question. On the evidence before the court, a jury could conclude that Plaintiff did not adequately disclose the extent of his heart condition, and did not disclose recent symptoms suggesting heart trouble.[2] A jury could also find, however, that his repeated disclosure of his bypass surgery, coupled with his affirmative responses to questions about "Heart Problems" and risk factors for heart disease, were sufficient. Moreover, a jury could find that Defendants' failure to ask follow-up questions in light of numerous red flags indicating heart disease shows willful blindness to Plaintiff's condition. The court cannot resolve these competing inferences on a motion for summary judgment.

---

[2]Some of the evidence of recent symptoms is weak. Defendant saw a doctor in February 2004 complaining of chest pain and difficulty walking long distances. The evidence shows, however, that the precursor to this visit was an injury to Plaintiff's ribs. The doctor did not believe Plaintiff's symptoms were cardiac, although he suggested that Plaintiff follow up with Dr. Haft.

ORDER – 5

**B.  If the Court Had Jurisdiction, It Would Find That Dr. Haft's Testimony Shows That Defendants' Maintenance Obligation Ended in December 2004.**

Defendants seek relief under Fed. R. Civ. P. 60(b) from the August 25 order based on evidence they acquired at Dr. Haft's September 21, 2005 deposition. In the August 25 order, the court relied on Dr. Haft's June 23, 2005 declaration that Plaintiff continued to receive medical treatment for "conditions related in part to Mr. Connor's [sic] work for Iquique U.S. L.L.C. on or about June 15, 2004," and that this treatment was "curative in nature." Haft Decl. ¶ 6(d). Based on this paragraph in Dr. Haft's declaration, the court found that Plaintiff had offered credible evidence that he had not reached maximum recovery from an injury or condition that first manifested aboard the UNIMAK. Defendants now contend that Dr. Haft's deposition testimony undermines this paragraph.

**1.  Dr. Haft's Deposition Testimony Shows That Plaintiff Reached Maximum Recovery No Later Than December 13, 2004.**

Dr. Haft's deposition testimony provides significant details that were missing from his earlier declaration. It reveals several specific manifestations of Plaintiff's coronary artery disease. It also reveals that Dr. Haft could only tie one of those manifestations to Plaintiff's time aboard the UNIMAK. Most importantly, Dr. Haft believes that Plaintiff reached maximum recovery as to that manifestation no later than December 2004.

**a.  Dr. Haft has clarified which manifestations of Plaintiff's coronary artery disease are attributable to the UNIMAK.**

Plaintiff has suffered from coronary artery disease since at least 2000. In August 2000, he underwent quadruple bypass surgery. He recovered from that surgery and was able to work. It appears that he worked at various jobs without restriction until he signed on as the Chief Engineer aboard the UNIMAK in late May 2004. He began to experience chest pain aboard the UNIMAK on June 15, 2004. Dr. Haft met with Plaintiff on June

ORDER – 6

18, 2004 and determined that unstable angina was the most likely cause of Plaintiff's pain. (Dep. at 33). Dr. Haft scheduled Plaintiff for a cardiac catheterization the next day.

The June 2004 catheterization revealed a complete occlusion of Plaintiff's left anterior descending coronary artery (Dep. at 39), a complete occlusion of the bypass graft in his second obtuse marginal artery branch (Dep. at 41), and three partial blockages in the bypass graft in his first obtuse marginal artery branch. The occlusion of the left anterior descending artery was present before his 2000 bypass surgery. (Dep. at 39-40).

Critically, the only graft blockage that Dr. Haft could identify as having likely occurred aboard the UNIMAK was the largest of the three partial blockages in Plaintiff's first obtuse marginal branch. Although he believed that plaque ruptures[3] had most likely caused all three blockages (Dep. at 46-47), only the rupture that led to the largest of them, a 95% blockage, likely occurred aboard the UNIMAK. (Dep. at 56, 93). That rupture likely caused Plaintiff's pain aboard the UNIMAK (Dep. at 51-52). Dr. Haft could not identify a likely cause of the other two blockages in the first obtuse marginal branch. (Dep. at 54, 93). He also could not identify a likely cause of the occlusion of the graft in Plaintiff's second obtuse marginal branch. (Dep. at 44-45).

The physicians who conducted the June 2004 catheterization also placed four stents in Plaintiff's first obtuse marginal branch. (Dep. at 63-64). Dr. Haft believes that in placing those stents, the physicians dislodged arterial plaque that traveled downstream and lodged in a smaller artery. This caused a very small myocardial infarction, or heart

---

[3]Patients with coronary artery disease often develop "plaque," or deposits of fats (often cholesterol), in their coronary arteries. A plaque rupture is a tearing of the plaque such that part of it protrudes into the artery and attracts blood clots, causing a complete or partial blockage of the artery. (Dep. at 17-18).

ORDER – 7

attack. (Dep. at 65-68). Dr. Haft expected Plaintiff to recover after the stenting and be able to return to work within one month. (Dep. at 73-74).

After his June 2004 catheterization and stenting, Plaintiff continued to experience chest pain. As a result, Dr. Haft conducted a second catheterization on December 13, 2004. (Dep. at 80). This procedure revealed that Plaintiff's first obtuse marginal branch had become completely occluded (Dep. at 81), likely as a result of a blood clot in one or more of the stents that were placed in the June 2004 procedure (Dep. at 82-83). Dr. Haft determined that any attempt to reopen that branch would likely fail (Dep. at 83-84), and that there was nothing more he could do to open the occlusion in that branch (Dep. at 95). The catheterization also revealed a new partial occlusion in Plaintiff's ramus intermediate branch, which Dr. Haft stented. (Dep. at 81).

Plaintiff continued to experience chest pain, leading to a third catheterization on July 22, 2005. (Dep. at 88). This catheterization revealed a new narrowing in Plaintiff's right coronary artery and a 90% blockage of the intermediate ramus branch that Dr. Haft had stented in December. (Dep. at 89). Restenosis, a buildup of scar tissue around the margins of the stent, likely caused the stent blockage. (Dep. at 90). Plaintiff underwent bypass surgery shortly after the 2005 catheterization. (Dep. at 88). The bypass surgery revealed that the first marginal obtuse branch was "ungraftable," and thus nothing could be done to relieve its occlusion. (Dep. at 97).

    **b. Plaintiff now has no evidence supporting maintenance beyond December 13, 2004.**

Dr. Haft's testimony establishes that Plaintiff has reached maximum recovery from the only injury or condition that likely occurred aboard the UNIMAK. Plaintiff's underlying coronary artery disease plainly pre-existed his work on the UNIMAK and is not attributable to Defendants. His current cardiac condition is the result of several

ORDER – 8

blockages in several different coronary arteries. Dr. Haft could attribute only one of those blockages (the largest blockage in the first obtuse marginal branch discovered in June 2004) to Plaintiff's time aboard the UNIMAK. When Dr. Haft discovered in December 2004 that the stents placed in that vessel had become occluded, he could not re-open the vessel, and thus he could do no more to improve that blockage.[4] In addition, Dr. Haft testified that the one blockage attributable to the UNIMAK did not cause any of the subsequent blockages. (Dep. at 115-16). There is thus no evidence of any other manifestation of Plaintiff's coronary artery disease that can be tied to the UNIMAK.

In its August 25 order, the court held that Plaintiff had offered evidence supporting each element of his maintenance claim, but that is no longer the case. The court's duty to resolve maintenance-related ambiguities and doubts in Plaintiff's favor pending a final resolution led it to accept Dr. Haft's declaration despite contrary evidence from Defendants. In light of Dr. Haft's deposition testimony, Plaintiff has no evidence that he has a condition attributable to the UNIMAK that has not reached maximum improvement. The court recognizes that Dr. Haft could not rule out the possibility that one or more of Plaintiff's other blockages could be attributed to his work on the UNIMAK, but this is not enough to justify a pretrial award of maintenance. Without evidence from a qualified

---

[4] Dr. Haft implicitly acknowledged that although Plaintiff's first obtuse marginal branch could not be reopened, a bypass graft surgery might have rerouted the vessel around the blockage. Dep. at 97 (admitting that he did not know that the vessel was "ungraftable" until Plaintiff's surgeons told him so after his July 2005 bypass). Plaintiff argues that this shows that no one knew that Plaintiff had reached maximum recovery until July 2005. The court disagrees. The critical fact is that Dr. Haft did not believe there was any medically appropriate means of treating the vessel in December 2004. Given the array of blockages that Dr. Haft discovered in December 2004, it is evident that he did not believe that bypass surgery was an appropriate option at that time. Bypass surgery was appropriate only after Dr. Haft discovered new blockages to a larger artery in the right side of Plaintiff's heart in July 2005.

ORDER – 9

witness that Plaintiff continues to recover from an injury he incurred aboard the UNIMAK, Plaintiff cannot justify maintenance beyond December 2004.

### c. The court finds insufficient authority for Plaintiff's attempt to enlarge the legal boundaries of maintenance and cure to permit recovery despite Dr. Haft's testimony.

At oral argument, Plaintiff's counsel clarified several legal arguments in an attempt to avoid the impact of Dr. Haft's testimony. First, he argues that Dr. Haft's testimony is irrelevant because there is no "causation" requirement for maintenance and cure. This argument misses the critical issue. It is true that a shipowner's maintenance obligation exists regardless of whether he was at fault for the seaman's injury. A shipowner is only liable, however, when a seaman "becomes ill or is injured *while in the service of the ship*." Vella v. Ford Motor Co., 421 U.S. 1, 3 (1975) (emphasis added). According to Dr. Haft, Plaintiff did not become ill while in service of the UNIMAK. His illness, coronary artery disease, arose at least four years earlier. Plaintiff suffered a discrete "injury" aboard the UNIMAK, the plaque rupture that led to the most significant blockage of his first obtuse marginal branch. This injury had reached maximum improvement as of December 13, 2004.

Second, Plaintiff argues that if a seaman's pre-existing illness manifests aboard the ship, the shipowner must pay maintenance and cure until that manifestation and all subsequent manifestations have reached maximum improvement. At oral argument, Plaintiff referred to this proposition as the "manifestation rule," but he has no authority for it. Plaintiff cites several cases in which a seaman's latent health condition manifested aboard a ship. Pltf.'s Opp'n at 10. These establish, at most, that a seaman can recover for an illness that pre-exists his time at sea. None of them support the "manifestation rule."

The Supreme Court's decision in Calmar S.S. Corp. v. Taylor, 303 U.S. 525 (1939), is also insufficient support for the "manifestation rule." In Calmar, the Court held

ORDER – 10

that a trial court had discretion to award maintenance and cure following a shipboard injury even if the medical treatment the seaman received was unrelated to the injury. 303 U.S. 525, 529-530 (1939). The Court reached its holding in recognition of the need to discourage any attempt by the "master or owner to determine in advance of any maintenance and cure, whether the illness was caused by the employment." Id. While Calmar recognizes that a court could award maintenance and cure "for a reasonable time after the voyage" (id. at 529) even where the illness recovered from was not attributable to the ship, it also holds that this obligation does not "extend[] beyond a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment." Id. at 530. Calmar thus has no application here. Defendants undisputedly paid maintenance and cure for six months following Plaintiff's voyage. Their request to end maintenance and cure now that medical evidence shows that Plaintiff's shipboard injury has reached maximum recovery is entirely consistent with Calmar.

      Finally, as an alternative to the "manifestation rule," Plaintiff argues that the right to maintenance and cure extends not until maximum recovery, but until the first time the parties have notice that the seaman has reached maximum recovery. Dr. Haft did not express his detailed opinions until his September 21, 2005 deposition, and Plaintiff therefore contends that maintenance and cure should extend until that date.[5] Plaintiff relies on Vella, where the Court considered the duration of the maintenance obligation for a seaman who suffered head trauma aboard his ship. 421 U.S. at 2. The court of appeals

---

[5] Alternatively, Plaintiff argues that because Dr. Haft testified that he did not know Plaintiff's first obtuse marginal branch blockage was "ungraftable" until Plaintiff's July 2005 bypass surgery, maintenance and cure should extend until the date of the surgery. The court disagrees. See supra n.4.

ORDER – 11

had reversed a maintenance and cure award because the medical testimony in the case established that the seaman's head injury was untreatable, and thus plaintiff was at maximum recovery immediately after the injury. Id. at 3. The Supreme Court reversed. It noted that no doctor had examined the seaman and determined that his head injury was treatable until four years after the voyage. Id. at 2-3. As it had done in Calmar, the Supreme Court relied on a policy of discouraging shipowners from making their own determinations about maximum medical improvement:

> Denial of maintenance and cure when the seaman's injury, though in fact permanent immediately after the accident, is not medically diagnosed as permanent until long after its occurrence would obviously disserve and frustrate the "combined object of encouraging marine commerce and assuring the well-being of seamen." A shipowner might withhold vitally necessary maintenance and cure on the belief, however well or poorly founded, that the seaman's injury is permanent and incurable.

Id. at 4. Plaintiff extends Vella beyond its scope, however, when he argues that maintenance and cure should extend not merely until an injury is medically diagnosed at maximum recovery, but until that medical diagnosis is communicated to the shipowner. Vella does not support this proposition, nor do the policy considerations underlying Vella. Vella establishes the right to maintenance and cure until a medical professional determines that the shipboard injury is at maximum recovery, but no longer. In this case, Dr. Haft's diagnosis that Plaintiff was at maximum recovery occurred on December 13, 2004. Defendants' maintenance and cure obligation ended on that date.

**2.   The Court Lacks Jurisdiction to Modify the August 25 Order.**

The court cannot grant relief from its August 25 order under Fed. R. Civ. P. 60(b) because it no longer has jurisdiction over the order. A party's notice of appeal divests the court of jurisdiction over the subject matter of the appeal. See City of Los Angeles v. Santa Monica BayKeeper, 254 F.3d 882, 885-886 (9th Cir. 2002); see also McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, 686 F.2d 731, 734 (9th Cir.

ORDER – 12

1982). When Defendants filed their October 12 notice of appeal, they placed the August 25 order beyond the reach of this court's power under Rule 60(b). Katzir's Floor & Home Design, Inc. v. M-MLS.COM, 394 F.3d 1143, 1148 (9th Cir. 2004).

The court has a limited role in reviewing a Rule 60 motion after appeal. It can indicate whether it would "entertain" such a motion or whether it would grant it. Crateo v. Intermark, Inc., 536 F.2d 862, 869 (9th Cir. 1976). If the court states that it would entertain or grant the motion, Defendants can move the Ninth Circuit to remand the case to this court. Id.; see also Williams v. Woodford, 306 F.3d 665, 683-84 (9th Cir. 2002) (voiding court's order on Rule 60(b) motion for lack of jurisdiction); see also Shepherd v. Int'l Paper Co., 372 F.3d 326, 329 (5th Cir. 2004) (describing procedure for resolving post-appeal Rule 60 motions).[6]

Putting jurisdictional concerns aside, the court questions whether Rule 60 is an appropriate means of challenging the August 25 order. Rule 60(b) permits a court to "relieve a party . . . from a final judgment, order, or proceeding . . . ." The Rule's Advisory Committee Notes clarify that the adjective "final" applies not only to "judgment," but to "order" and "proceeding" as well. Rule 60(b) does not apply to non-final orders. See Santa Monica BayKeeper, 254 F.3d 882, 886-87 (9th Cir. 2001). The court made no final adjudication of any issue in the August 25 order. The court

---

[6]In an unsolicited supplemental brief filed after oral argument, Defendants addressed jurisdiction for the first time. They contend that the court retains jurisdiction under the authority of Miller v. Marriott Int'l, Inc., 300 F.3d 1061 (9th Cir. 2002). Miller merely states the effect of revisions to Fed. R. App. P. 4, which now grants a district court jurisdiction of a Rule 60 motion filed within 10 days of an appealed judgment. Id. at 1063-64 (citing Fed. R. App. P. 4(A)(vi), 4(B)(i)). The order from which the appeal is taken serves as the "judgment" in an interlocutory appeal. Balla v. Idaho State Bd. of Corr., 869 F.2d 461, 466 (9th Cir. 1989). Defendants did not bring the instant Rule 60 motion within 10 days of the August 25 order, and thus did not preserve this court's jurisdiction.

ORDER – 13

determined that Plaintiff had produced enough evidence on his maintenance claim to receive payments. At the same time, the court recognized that Defendants could prove on summary judgment or at trial that they did not owe maintenance.

Because the August 25 order made no final determination, the court queries whether the August 25 order is appealable. In admiralty cases, 28 U.S.C. § 1292(a)(3) permits appeal of "[i]nterlocutory decrees" that "determin[e] the rights and liabilities" of parties. This provision is "construed narrowly" to allow appeals only of orders that finally determine some aspect of a party's rights or liabilities. Wallis ex rel. Wallis v. Princess Cruises, Inc., 306 F.3d 827, 832 (9th Cir. 2002). The August 25 order did not "determine" the right to maintenance,[7] it merely established that Plaintiff should receive maintenance payments pending final adjudication.

The lack of finality in the August 25 order has another consequence. Rule 60 does not apply when a court considers whether to modify its own interlocutory order. Santa Monica BayKeeper, 254 F.3d at 889. Instead, a court reviews its interlocutory order "for any cause seen by it to be sufficient" to modify the order. Id. (quoting Melancon v. Texaco, Inc., 659 F.2d 551, 553 (5th Cir. 1981)).

Despite these concerns, the best course for the court is to treat Plaintiff's request for relief as a Rule 60(b) motion. Defendants' appeal means that the Ninth Circuit must decide whether the August 25 order was "final," a decision that will determine whether the order is appealable, which will in turn determine whether this court should review it

---

[7] Other circuits have permitted interlocutory appeals of awards of maintenance and cure, but only after the district court made a final determination of the issue. E.g., LeBlanc v. B.G.T. Corp., 992 F.2d 394, 396 n.3 (1st Cir. 1991) (noting that underlying order had "definitively resolved the maintenance-and-cure count"); West v. Midland Enters., Inc., 227 F.3d 613, 614-15 (6th Cir. 2000) (noting that district court had granted judgment for plaintiff on maintenance and cure).

ORDER – 14

under Rule 60 or its inherent power.  Until the Ninth Circuit acts, the court must construe Defendants' appeal as well-taken, and therefore must treat the August 25 order as "final" under 28 U.S.C. § 1292(a)(3) and reviewable under Fed. R. Civ. P. 60(b).

The court holds that if it had jurisdiction over Defendants' Rule 60 motion, it would grant it.  Dr. Haft's deposition testimony significantly undermines his more general statements in his declaration, and demonstrates that Plaintiff lacks evidence to support an award of maintenance beyond December 13, 2004.  The court would find that Defendants' failure to take Dr. Haft's deposition sooner was excusable neglect.  The court would thus grant relief from the August 25 order under Fed. R. Civ. P. 60(b)(1).  Defendants must now decide whether to seek remand or other action in the Ninth Circuit that would permit the court to rule on their motion.

>    3.   **The Court Partially Stays Enforcement of the August 25 Order Pending Action in the Ninth Circuit.**

Although the court has no jurisdiction to modify the August 25 order, the court has inherent power to take action to recognize the effect of new evidence while an appeal is pending.  Hoffman v. Beer Drivers & Salesmen's Local Union No. 888, 536 F.2d 1268, 1276 (9th Cir. 1976); see also Thomas, Head & Greisen Employees Trust v. Buster, 95 F.3d 1449, 1460 (9th Cir. 1996).  For the reasons noted above, the court finds that it would be manifestly inequitable to require Defendants to make maintenance payments beyond December 13, 2004.  The court thus orders that, pending resolution of the appeal of the August 25 order or new evidence from the Plaintiff, Defendants need not make maintenance payments after December 13, 2004.  Defendants have submitted unchallenged evidence that they have already made maintenance payments through that date, so no further payments are owing at this time.

ORDER – 15

**C.    Defendants Must Compensate Plaintiff for Their Refusal to Comply with the August 2005 Order.**

Although the court would modify its August 25 order (if it had jurisdiction) in light of Dr. Haft's testimony, the court stresses that Defendants have shown no factual error in the order. On the evidence before it in August, the court properly concluded that Plaintiff had adduced evidence in support of each element of his claim for maintenance. The new evidence from Dr. Haft's deposition leads the court to a different conclusion. Nonetheless, from August 25 until today, Defendants deprived Plaintiff of the benefit of thousands of dollars in maintenance payments, and did so in violation of the court's order.

Defendants have no excuse for failing to comply with the court's order. Defendants' sole justification for refusing to pay maintenance is that they were unable, despite their diligence, to depose Dr. Haft sooner. This explanation fails for several reasons. First, a party's speculation that it may obtain favorable evidence at a later date is no excuse for ignoring a court order. In the briefing preceding the August 25 order, Defendants requested that the court delay its ruling until they could depose Dr. Haft. They renewed that request in their motion for consideration. In each case, the court found this request an insufficient basis to delay maintenance and cure. Incredibly, Defendants' counsel stated at oral argument that its defiance of the August 25 order was justifiable because he "thought the court would like to know" what Dr. Haft had to say. The August 25 order and subsequent order denying reconsideration left no doubt that although the court was interested in what Dr. Haft had to say, it would not withhold maintenance and cure pending his testimony. Defendants' unilateral decision to withhold payment is contemptuous.

Second, even if the court were disposed to find that a quest for more favorable evidence justified disobeying its orders, Defendants did not begin their efforts to schedule

ORDER – 16

Dr. Haft's deposition until July 12, 2005, more than four months after Plaintiff filed this action.

Defendants' flaunting of the August 25 order not only demonstrated a lack of respect for the court's authority, it also harmed Plaintiff. In order to satisfy various creditors, Plaintiff took out a $15,000 loan on August 23, 2005. To obtain a loan in his precarious financial position, Plaintiff paid a $2,500 origination fee and agreed to an interest rate of 2.99% per month. Defendants' refusal to comply with the order deprived Plaintiff of money he could have used to reduce the balance of the loan.

The court has inherent power to impose sanctions against litigants for willful disobedience of its orders. Gomez v. Vernon, 255 F.3d 1118, 1133 (9th Cir. 2001). The court may exercise that power where it finds that a litigant has acted in bad faith or in a manner tantamount to bad faith. Id. at 1134 (citing Fink v. Gomez, 239 F.3d 989 (9th Cir. 2001)). Where a litigant has acted recklessly and for an improper purpose, its conduct is tantamount to bad faith. Fink, 239 F.3d at 992 (noting even truthful statements and non-frivolous arguments can have an improper purpose).

Defendants have offered no legitimate basis for disobeying the court's order. They simply did not want to pay Plaintiff. The court does not fault the Defendants for seeking new evidence to show that they did not owe maintenance, but there is no justification for ignoring the court's order in the meantime. The court therefore finds that Defendants disobeyed the August 25 order in bad faith. Sanctions are appropriate.

The court finds that the appropriate sanction is to require Defendants to compensate Plaintiff for the harm their defiance caused. Although there is no precise remedy, the following methodology provides Plaintiff with reasonable compensation. Until the date of this order, Defendants were under court order to pay maintenance at $40 per day. 320 days have passed between December 13, 2004, the last date for which

Defendants have paid maintenance, and November 7, 2005. Plaintiff should have received $13,000 in maintenance over that time period, and was forced to take a $15,000 loan in the interim. Thus, Defendants are responsible for 86.7% (13/15) of that loan from August 23 until today. The court orders Defendants to pay 86.7% of Plaintiff's loan origination fee, or $2,166.67. In addition, Defendants must pay 86.7% of the interest Plaintiff has accrued on the loan until today, or $1,148.82.[8] If Defendants do not pay Plaintiff all of this money by November 11, 2005, the amount they owe shall increase by $50 each day that they fail to pay Plaintiff. If Defendants do not pay by November 11, the court will institute contempt proceedings, and will consider entering default as a sanction.

Separate from the sanctions described above, the court orders Defendants to pay Plaintiff the reasonable attorneys' fees that he incurred in bringing his motion to compel compliance with the court's August 25 order. See Glynn v. Roy Al Boat Mgmt. Co., 57 F.3d 1495, 1501 (9th Cir. 1995) (noting availability of attorneys' fees for "willful and persistent" withholding of maintenance and cure).

### IV. CONCLUSION

For the reasons stated above, the court DENIES Defendants' motion for summary judgment (Dkt. # 56), DENIES Defendants' Rule 60(b) motion (Dkt. # 52) pending action in the Ninth Circuit, and GRANTS in part and DENIES in part Plaintiff's motion to compel compliance with the court's August 25 order. Defendants have no obligation to

---

[8] At a 2.99% monthly rate, Plaintiff pays interest of $523.25 per month, or $17.44 per day. In the 76 days between August 23 and November 7, 2005, Plaintiff has accrued $1,325.56 in interest. Defendants are responsible for 86.6% of this amount, or $1,148.82.

ORDER – 18

make further maintenance payments pending resolution of their appeal.  Defendants must, however, pay the sanctions described above.

Dated this 8th day of November, 2005.

                                                    s/James L. Robart

                                        _____
                                        JAMES L. ROBART
                                        United States District Judge

ORDER – 19